IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2003-cr-40086-JPG |
| ) | |
| W. DAVID ROMMEL, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

**GILBERT, District Judge:**

This matter comes before the Court on Rommel's FED. R. CRIM. P. 29 motion for a judgment of acquittal on Counts 16 and 17 of the indictment in this case (Doc. 72), to which the government responded (Doc. 74) and Rommel replied (Doc. 77). The Court has also considered Rommel's bench brief (Doc. 80) and the oral arguments presented by counsel in reaching its judgment. That said, the Court finds that Rommel's motion should be GRANTED, and that an acquittal should be adjudged on the counts at issue here.

Familiarity with the facts of this case is assumed for present purposes. As relevant here, Counts 16 and 17 of the indictment charge the defendant, W. David Rommel, D.D.S., with money laundering in violation of 18 U.S.C. §1956(a)(1)(A)(i) and 2. The government's theory of liability focuses on two separate transactions: one, "check #1057 in the amount of $68,000, drawn on the State Bank of Whittington [and] made payable to Ohio Bank[, which was

used] to pay off the lien on [Rommel's] office property;" and two, "check #7252 in the amount of $42,022.92, drawn on the State Bank of Whittington, [used] to make a loan payment to Sky Financial on a loan obtained to purchase the equipment, furniture, and other assets of the dental practice." Internal Revenue Service Special Agent Robert Jeffery Anderson provided the lion's share of the government's evidence on this issue at trial. Indeed, Anderson's testimony not only supported these allegations, but it seemed to allow the jury to properly find both allegations true–a proposition apparently uncontested by the defense. But as a careful look at Rommel's cross examination of Anderson reveals, Rommel was clearly out for bigger game at that point. To that end, Anderson conceded that the transactions at issue involved purchases of "things [Rommel] was using to be a dentist" (Tr. 198), not "offshore bank accounts or anything." (Tr. 196). As we've suggested, that concession didn't appear to mean much at the time–that is, until the government rested its case in chief and Rommel fired back with a FED. R. CRIM. P. 29(a) motion for judgment of acquittal. Rule 29 provides, "After the government closes its evidence . . . the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." And so Rommel argues, offering two ways of reaching that conclusion. Because Rommel's first argument hits center mass, it's unnecessary to address the second of these arguments. The winning theory is simple. Section 1956 proscribes "conduct[ing] or attempt[ing] to conduct . . . a financial transaction

which in fact involves the proceeds of specified unlawful activity." *United States v. Scialabba*, for its part, holds that "proceeds" are limited to amounts derived from gross income (as opposed to net income) and don't therefore include "revenue [used] to meet the expenses of the business." 282 F.3d 475, 476 (7th Cir. 2002). Therefore, Rommel concludes, the evidence didn't establish that "proceeds" were ever involved here.

Lawyers know that identifying an argument's major premise is the most appropriate place to begin any disciplined analysis, and in this case the government questions the soundness of *Scialabba* from the get-go. On this score, it correctly notes that *Scialabba* was criticized and rejected by two circuits courts, compare *United States v. Grasso*, 381 F.3d 160 (3d Cir. 2004), with *United States v. Iacaboni*, 363 F.3d 1 (1st Cir. 2004), and hasn't been followed by any other circuit court, though the government correctly recognizes *Scialabba* as the controlling law of this circuit. As such, the Court understands the government's intent as preserving the issue for further review, for it's axiomatic that this Court is powerless to ignore binding precedent and it certainly won't do so in this case. In any event, the "aberration" ostensibly created by *Scialabba* evaporates significantly upon closer scrutiny.

*Scialabba* involved two defendants convicted of running an unlawful gambling business–"the slot machine business," to be exact. Winners received on-screen credits which "could be used lawfully to continue playing, or unlawfully as the basis of cash payouts," as "[m]any retail outlets redeemed

credits for cash." 282 F.3d at 475. When the defendants, who owned and serviced the slot machines, "opened the coin boxes [of the slots], the contents would be split with the outlet's owner: some went to cover the payments made to customers, some was retained by the owner as compensation for his role in the business, and defendants kept the rest as compensation for the machines." 282 F.3d at 476. The Seventh Circuit, in addressing whether those payments to retail owners involved "proceeds" of unlawful activity, rejected such an approach and made the following distinction: "We now hold that the word 'proceeds' in §1956(a)(1) denotes net rather than gross income of an unlawful venture." 282 F.3d at 478. In so holding, *Scialabba* recognized that "the context [of the statute] does not reveal whether the reference is to gross receipts or net income," 282 F.3d at 477, and cited the Rule of Lenity as further support for its conclusion. Indeed, *Grasso* (a decision which criticized and declined to follow *Scialabba*) itself recognized that "Judge Easterbrook's opinion in *Scialabba* is well-argued and intuitively appealing." 381 F.3d at 167. Moreover, two other circuit courts have reached results similar to the one reached in *Scialabba* on similar facts, though, as we'll see momentarily, by a different methodology.

Consider *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004). Like this case, Medicare fraud was at issue there. Among other things, the defendants had "submitted cost reports that grossly inflated expenses for items ranging from mileage to employee salaries," 360 F.3d at 475, though, importantly, the

"patients actually received the home health care services that Medicare contracted with [the defendants] to provide." 360 F.3d at 478. Payments made for rent, payroll and payroll taxes were the alleged money laundering transactions. 360 F.3d at 476. Subsection (A)(i) of §1956(a)(1) requires the government to establish that the financial transaction at issue was conducted "with the intent to promote the carrying on of specified unlawful activity," and in *Miles*, the court rejected the notion that payments for rent, payroll, and payroll taxes were indicative of such an intent. On this *Miles* wrote: "[W]hen a legitimate business pays customary, reasonable and legal operating expenses, neither it nor its principals should be subject to money laundering promotion for those payments. The crime of money laundering promotion is aimed not at maintaining the legitimate aspects of a business nor at proscribing all expenditures of ill-gotten gains, but only at transactions which funnel ill-gotten gains directly back into the criminal venture." 360 F.3d at 479. *United States v. McGahee*, 257 F.3d 520 (6th Cir. 2001), for its part, reached a similar result. Collusion between a builder and government intermediary was the conduct at issue in that case; the intermediary fraudulently approved progress payments to the builder for work that hadn't been done yet. The three money laundering transactions consisted of payments on a personal mortgage, a personal loan, and a car loan. 257 F.3d at 526. Finding the evidence insufficient to sustain the conviction, *McGahee* explained: "Paying for personal goods, alone, is not sufficient to establish that funds were used to promote an illegal activity. . . .

-5-

The Government's theory that the payments supported the business and that the business existed, at least in part, to collect illegal funds is not sound. . . . To further a criminal activity, the transaction must be explicitly connected to the mechanism of the crime." 257 F.3d at 257.  Thus, like *Scialabba*, both *Miles* and *McGahee* found that transactions involving money spent on the ordinary expenses of a business–that it was a basically legitimate business was important to the holdings in *Miles* and *McGahee*, to be sure, i.e., one in which clients receive legal value for their fees, *Miles*, 360 F.3d at 478–won't support a conviction.  The difference is that *Scialabba* reached its result by limiting the meaning of "proceeds," while *Miles* and *McGahee* found the payments of such expenses insufficient to exhibit an "intent to promote" the unlawful activity. Parenthetically, the Court notes that *Miles* and *McGahee* form the basis of Rommel's second argument and demonstrate why his two positions aren't "Catch 22s" as the government asserts.  In *United States v. Jackson*, 935 F.3d 832, 842 (7th Cir. 1991), the court described this provision (i.e., subsection ((a)(i), intent to promote unlawful activity) as being aimed "at the practice of plowing back proceeds" into the unlawful activity.  In that case the court held that spending money on items not "essential" to an unlawful activity didn't suggest an intent to promote the activity.  935 F.3d at 841.  So the problem was again one of allocation–Rommel's precise argument on this score.

      So viewed, is one approach superior to the other, or is this just a case of two courts looking at a Rorschach inkblot?  *Scialabba's* principal shortcoming,

as the government notes in its brief in this case, is that the "statute is cleft in two: one prong, Section 1956(A)(1)(A), clearly does not go to traditional concepts of money laundering–instead, [it] is directed at spending (not concealing) the proceeds of illegal activity in order to continue the illegal operation."  *Miles* and *McGahee* withstand this argument because the transactions at issue in those cases couldn't be allocated solely to the unlawful activity itself.  Therefore, one might say, the transactions didn't clearly "promote" the "unlawful activity"; rather, they either promoted the business itself (*Miles*), or the defendant's personal affairs (*McGahee*).  For what it's worth, *Scialabba* could've likely rested its decision on similar grounds; recall that "credits could be used lawfully to continue playing, or unlawfully as the basis of cash payouts."  282 F.3d at 475-476.  Therefore, the business as a whole was probably legitimate under *Miles* in that customers received legal "value" for their money.  But *Scilabba* goes further.  It compares the payout transactions at issue in that case to a drug dealer "using the receipts from sales to purchase more stock in trade," or a bank robber "using part of the loot from one heist to rent a getaway car for the next," 282 F.3d at 476, both of which are illegitimate businesses.  So the holding in *Scialabba* clearly rests on the nature or significance of the expense, not the government's inability to allocate the expense to the unlawful activity.  *Scialabba's* other shortcoming lies in the statement of its rule: "proceeds" don't include amounts fairly characterized as "expenses" of the business, regardless of whether the business itself is lawful

or unlawful.  Suppose in this case Rommel had been bribing a state official to accept his fraudulent claims and that this was the only way in which he could execute the scheme.  Under such circumstances, it would be exceedingly difficult to say he wasn't "promoting" unlawful activity, though an accountant would certainly view the payments as "expenses" of the unlawful activity.

By viewing the issue as a problem of expense allocation, however–and therefore ignoring the nature and significance of the expense itself–*Miles* and *McGahee* reveal their own weakness, as *Scialabba* recognized.  "By reading §1956(a)(1) to cover only transactions involving profits, we curtail the overlap and ensure that the statutes may be applied independently to sequential steps in a criminal enterprise."  282 F.3d at 477.  This conclusion necessarily flows from *Miles* and *McGahee's* approach; for when the business is wholly illegitimate, it's hard to say that every dollar spent doesn't "promote" the unlawful activity.  Moreover, that the significance of the expense is relevant (especially when the business is wholly illegitimate and there's no allocation ground to hang one's hat on) finds support in the fact that courts are reluctant to find "promotion" absent a clear allocation of the particular expense to the unlawful activity, e.g., *Miles* and *McGahee,* and the congressional intent reflected in the overall statutory scheme. Cf. 18 U.S.C. §1957(a) (setting a $10,000 minimum on prosecutions for the expenditure of unlawfully obtained funds).  Neither *Grasso,* 381 F.3d 160, nor *Iacaboni,* 363 F.3d 1, addressed the expenses at issue in those cases in this sense.  And of course, as defense

counsel has often reminded us in this case, there's a danger of turning the money laundering statute into a money spending statute. *United States v. Brown,* 186 F.3d 661, 670 (5th Cir. 1999). That said, drawing a line in the sand as to where routine and relatively minor expenses paid to further a wholly illegitimate business cross the line into "promotion of unlawful activity" is easier said than done. And perhaps this brings us right back to *Scialabba*, a rule that's nothing if not simple.

However all this may be, the foregoing discussion presents no problem in this case. The transactions at issue here–Rommel's purchase of an office building, equipment, furniture, and other assets for his dental practice–are insufficient to sustain a conviction under either view. For one thing, under *Scialabba*, these assets clearly became expenses of Rommel's dental practice at some point, though they may have appeared as assets on his balance sheet–at least initially–not as expenses on his income statement. After all, this is no audit, and the fact that Rommel paid for these assets by lump sum payment, rather than incurring monthly rental expenses for the same assets, is as true as it is irrelevant; both the tax code and generally accepted accounting principles recognize the concept of depreciation. As a function of net income, the effect of depreciation is the same as if he'd been paying monthly rental expenses. Both are deducted to arrive at net income. Similarly, under *Miles* and *McGahee*, the expenses at issue here went to maintaining Rommel's dental practice–a concern which provided "value" to its customers in exchange for the

fees paid by the government–and cannot be allocated solely to the fraudulent scheme alleged in this case.  It's not as if, as in the example above, these payments were made to bribe someone as an essential part of the fraudulent scheme or to add a fraudulent billing wing onto his practice.  On that note, the Court disagrees with the largely unreasoned decision reached in *United States v. Lawrence*, 405 F.3d 888, 901 (10th Cir. 2005), holding to the contrary. ("Likewise, keeping the doors of the clinic open assisted Lawrence in carrying out his fraudulent scheme.").

For the foregoing reasons, Rommel's motion for judgment of acquittal on Counts 16 and 17 of the indictment in this case (Doc. 80) is **GRANTED** and those counts are **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

**Dated: July 5, 2005.**

<u>**/s/ J. Phil Gilbert**</u>
**J. PHIL GILBERT**
**U.S. District Judge**